# No. 24-1733

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

VERIZON COMMUNICATIONS INC.,
*Petitioner,*

v.

UNITED STATES FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,
*Respondents.*

On Petition for Review of a Final Order
of the Federal Communications Commission

## BRIEF OF CTIA – THE WIRELESS ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER AND FOR VACATUR OF THE FCC'S FORFEITURE ORDER

Joshua S. Turner
  *Counsel of Record*
Sara M. Baxenberg
Boyd Garriott
Stephen J. Conley
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
Jturner@wiley.law

November 11, 2024

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, CTIA –
The Wireless Association states that it has no parent company, and no publicly held
corporation owns 10% or more of its stock.

November 11, 2024

*/s/ Joshua S. Turner*
Joshua S. Turner
*Counsel of Record for* Amicus Curiae

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES .................................................... iii

INTEREST OF *AMICUS CURIAE*...........................................1

INTRODUCTION ................................................................2

BACKGROUND ..................................................................3

    A.   Congress Adopted Section 222 In The Deregulatory Telecommunications Act, With No Reference to "Location."...3

    B.   In 1999, Congress Added "Location" To The Definition Of CPNI To Facilitate Emergency Response And Regulate Call Location Information.................................................................4

    C.   The Commission Declined To Offer Its Views On "Location." 5

    D.   The Commission Adopted A "Reasonable Measures" Standard For Handling CPNI And Held That Only Call Location Information Qualifies As CPNI. ................................................7

ARGUMENT ....................................................................10

  I.   The Forfeiture Order Misinterprets The Statute. ................10

    A.   The Information Does Not Relate to the "Location Of Use Of A Telecommunications Service."................................................10

    B.   The Information Was Not Made Available "Solely By Virtue Of The Customer-Carrier Relationship."......................................15

    C.   Deference Cannot Save The Commission's Interpretation. .....18

  II.   The Forfeiture Order Violates Fair Notice...........................19

    A.   Section 222 Did Not Afford Verizon Fair Notice That CPNI Includes Passively-Collected Location Information.................20

    B.   The Commission Failed to Afford Verizon Fair Notice That Its Security Measures Violated Agency Rules. ............................23

  III.   The Forfeiture Order Violates The Seventh Amendment...................26

CONCLUSION....................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996)............................................................................29

*AT&T Corp. v. FCC,*
   323 F.3d 1081 (D.C. Cir. 2003).........................................................29

*Citizens United v. Schneiderman,*
   882 F.3d 374 (2d Cir. 2018) ..............................................................25

*Corner Post, Inc. v. Board of Governors of Federal Reserve System,*
   144 S. Ct. 2440 (2024).......................................................................29

*Cunney v. Board of Trustees of Village of Grand View,*
   660 F.3d 612 (2d Cir. 2011) .........................................................20, 23

*Dubin v. United States,*
   599 U.S. 110 (2023)............................................................................10

*Facebook, Inc. v. Duguid,*
   592 U.S. 395 (2021)............................................................................12

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012).................................................................19, 20, 21

*Koontz v. St. Johns River Water Management District,*
   570 U.S. 595 (2013)............................................................................29

*Loper Bright Enterprises v. Raimondo,*
   144 S. Ct. 2244 (2024).............................................................18, 19, 21

*Mozilla Corp. v. FCC,*
   940 F.3d 1 (D.C. Cir. 2019)...............................................................16

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,*
   588 U.S. 1 (2019)...............................................................................29

*SEC v. Fowler,*
   6 F.4th 255 (2d Cir. 2021) .................................................................28

*SEC v. Jarkesy*,
144 S.Ct. 2117 (2024)....................................................................26, 27

*United States v. Stevens*,
691 F.3d 620 (5th Cir. 2012) ...............................................29

*Upton v. SEC*,
75 F.3d 92, 98 (2d Cir. 1996). ..........................................20, 22

**Statutes**

5 U.S.C. § 801 .................................................................................9, 22

28 U.S.C. § 2462 ...............................................................................28

47 U.S.C. § 153 .......................................................................13, 15, 16

47 U.S.C. § 222 ............................................. 4, 5, 7, 10, 11, 12, 14, 15, 18

47 U.S.C. § 503 ...............................................................................27

47 U.S.C. § 504 ...............................................................................28

Joint Resolution Providing for Congressional Disapproval of
"Protecting the Privacy of Customers of Broadband and Other
Telecommunications Services," Pub. L. No. 115-22, 131 Stat. 88
(2017)............................................................................................9

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ....................4

Wireless Communications and Public Safety Act of 1999, Pub. L. No.
106-81, 113 Stat. 1286 ...........................................................4

**Regulations**

47 C.F.R. § 64.2010 ...................................................................7, 20

**Constitutional Provisions**

U.S. Const. amend. V...............................................................19

U.S. Const. amend. VII.............................................................26

iv

## Agency Materials

*Implementation of 911 Act*,
Fourth Report and Order and Third Notice of Proposed
Rulemaking, 15 FCC Rcd. 17079 (2000) ............................................5

*Implementation of the Telecommunications Act of 1996*,
Order on Reconsideration, 144 FCC Rcd. 14409 (1999) ...................17

*Implementation of the Telecommunications Act of 1996*,
Report and Order and Further Notice of Proposed Rulemaking, 22
FCC Rcd. 6927 (2007)................................................................7, 24

*Implementation of the Telecommunications Act of 1996*,
Second Report and Order and Further Notice of Proposed
Rulemaking, 13 FCC Rcd. 8061 (1998) ............................................3

*Implementation of the Telecommunications Act of 1996*,
Third Report and Order and Third Further Notice of Proposed
Rulemaking, 17 FCC Rcd. 14860 (2002) ..........................................6

*Implementation of the Telecommunications Act of 1996*, Declaratory
Ruling, 28 FCC Rcd. 9609 (2013)..........................................8, 12, 22

*Protecting the Privacy of Customers of Broadband and Other
Telecommunications Services*,
Report and Order, 31 FCC Rcd. 13911 (2016).................................8, 9

*Report to Congress on Robocalls and Transmission of Misleading or
Inaccurate Caller Identification Information*, FCC (Dec. 27, 2023) .................28

*Request By CTIA to Commence Rulemaking to Establish Fair
Location Information Practices*,
Order, 17 FCC Rcd. 14832 (2002) ......................................................6

*Restoring Internet Freedom*,
Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd.
311 (2018)...................................................................................9

## Other Authorities

H.R. Rep. No. 104-458 (Conf. Rep.) .......................................................3

Merriam-Webster's Dictionary 1118 (10th ed. 1994) ..............................................16

Petition of CTIA for a Rulemaking to Establish Fair Location
    Information Practices, WT Docket No. 01-72 (filed Nov. 22, 2000)..................6

Press Release, Federal Court Enters $9.9M Penalty and Injunction
    Against Man Found to Have Caused Thousands of Unlawful
    Spoofed Robocalls, DOJ (Mar. 22, 2024),
    https://tinyurl.com/2vf2hfvu ...................................................................................28

Restatement (Third) of Torts (Am. L. Inst., June 2024 Update) ...........................27

S. Rep. No. 104-230 (Conf. Rep)...............................................................................3

S. Rep. No. 106-138................................................................................4, 5, 11

Webster's Third New International Dictionary 307 (1993) ....................................16

## INTEREST OF *AMICUS CURIAE*[1]

CTIA – The Wireless Association® ("CTIA") files this brief in support of Petitioner Verizon Communications Inc. ("Verizon").  CTIA represents the U.S. wireless communications industry and the companies throughout the mobile ecosystem that enable Americans to lead a 21st-century connected life.  The association's members include wireless providers, device manufacturers, and suppliers, as well as apps and content companies.  CTIA vigorously advocates at all levels of government for policies that foster continued wireless innovation and investment.

CTIA has an interest in this proceeding because its member companies, including Petitioner, are regulated by Respondent Federal Communications Commission ("FCC" or "Commission"), which holds broad regulatory and enforcement power over *amicus*'s members.  Accordingly, *amicus* has an interest in the FCC's interpretation of its authorizing statutes, including the agency's efforts to impose civil penalties based on novel statutory interpretations through administrative proceedings rather than Article III courts.

---

[1] All parties have consented to the filing of this brief.  No counsel for any party authored this brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting the brief.  No entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of the brief.  *See* Fed. R. App. P. 29(a)(4)(E).

# INTRODUCTION

For years, wireless service providers enabled beneficial, legitimate uses of customer location data with their customers' consent. These uses included the provision of emergency assistance, fraud detection, and more. And for years, the FCC was aware of these services, never once suggesting an issue. But after a third party not before this Court misused a location service, the Commission changed its mind and, in the Order under review, declared Verizon's location-based services unlawful—levying a $46.9-million forfeiture to boot. The Commission's newfound interpretation is patently unlawful and flouts both the text of the statute and decades of the agency's own precedent. If that were not enough, the Commission seeks to apply its surprise interpretation in an administrative-enforcement posture that deprives Verizon of its Seventh Amendment right to a jury trial.

Ironically, the Commission's unlawful action against Verizon will not protect consumer location data from any "ongoing" threat. Forfeiture Order (Carr Dissent) (JA87). Instead, it will do the opposite. The Commission's unlawful order has forced wireless providers out of the location-based services industry, "effectively chok[ing] off one of the only ways that valid and legal users of consent-based location data services had to access location data." Forfeiture Order (Simington Dissent) (JA90). The result is to "push[ ] legitimate users of location data toward unregulated data brokerage"—with "any of thousands of unregulated apps" from

2

which to choose. *Ibid.* That will "*reduce[ ]* consumer data privacy." *Ibid.* (emphasis added).

This Court should vacate the Forfeiture Order.

## BACKGROUND

The history of Section 222 of the Communications Act shows that the word "location" in the definition of CPNI refers to location at the time a call is made. The Commission's prior precedent reinforces the conclusion that this is the best reading of the statute. As explained below, this legislative context belies the novel interpretation that the FCC adopted in the Order.

### A. Congress Adopted Section 222 In The Deregulatory Telecommunications Act, With No Reference to "Location."

Congress passed the Telecommunications Act of 1996 (the "Telecommunications Act") to create a "pro-competitive, de-regulatory national policy framework." S. Rep. No. 104-230, at 113 (1996) (Conf. Rep.) (Joint Statement of Managers). In it, Congress added Section 222 "to balance both competitive and consumer privacy interests with respect to" Customer Proprietary Network Information ("CPNI"). H.R. Rep. No. 104-458, at 205 (1996) (Conf. Rep.). The provision reflected Congress's concern that providers with access to sensitive information would "gain a competitive advantage in the unregulated [customer premises equipment] and enhanced services markets." *See Implementation of the*

*Telecomms. Act of 1996*, Second Report and Order and Further Notice of Proposed Rulemaking, 13 FCC Rcd. 8061, ¶ 7 (1998).

The Telecommunications Act defined "CPNI" as:

(A) information that relates to the quantity, technical configuration, type, destination, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier; except that such term does not include subscriber list information.

Pub. L. No. 104-104, § 702, 110 Stat. 56 (1996).

### B.    In 1999, Congress Added "Location" To The Definition Of CPNI To Facilitate Emergency Response And Regulate Call Location Information.

Congress added the term "location" to the definition of CPNI through the Wireless Communications and Public Safety Act of 1999 ("911 Act"). Pub. L. No. 106-81, 113 Stat. 1286. The 911 Act sought to solve a straightforward problem: public safety answering points (i.e., 911 call centers) could not "locat[e] wireless callers" because they were "mobile," unlike "caller[s]" on "wireline phones" that operated "at a fixed location." S. Rep. No. 106-138, at 2, 7-8 (1999).

The 911 Act thus amended Section 222 to facilitate "the provision of call location information to emergency service personnel." *Ibid*. It required phone companies to "provide information … to providers of emergency services, and providers of emergency support services." 47 U.S.C. § 222(g). It exempted, from

4

restrictions on the use, disclosure, and access to CPNI, the provision of "call location information concerning the user of a commercial mobile service" in specific emergency situations. *Id*. § 222(d)(4). And it added a new subsection—"Authority to use location information"—to limit the scope of customer approval for the use, disclosure, and access of "call location information" and "automatic crash notification information." *Id.* § 222(f).

Congress accompanied its expanded access to call location information with corresponding privacy protections for this information. Congress recognized that "requir[ing] the provision of call location information to emergency service personnel," made it important to simultaneously "provide[ ] privacy protection for the call location information of users of wireless phones." S. Rep. No. 106-138, at 2, 7 (1999); *see also id.* at 5 (discussing need for privacy protections). It thus, *inter alia*, added "location" to the definition of CPNI to subject call location information to Section 222's privacy protections. *See* 47 U.S.C. § 222(h).

## C.    The Commission Declined To Offer Its Views On "Location."

For years following the 911 Act, the Commission declined to opine on the amendments to Section 222. It avoided them in its 911 Act proceeding, concluding that the provisions "amend[ing] Section 222" would be "better addressed in [the FCC's] current CPNI and subscriber list information proceedings." *Implementation*

*of 911 Act*, Fourth Report and Order and Third Notice of Proposed Rulemaking, 15 FCC Rcd. 17079, ¶ 7 (2000).

CTIA then petitioned the Commission in 2000, requesting "a rulemaking proceeding to implement" the 911 Act's changes to Section 222, including the addition of "location" in the definition of CPNI. *See* Petition of CTIA for a Rulemaking to Establish Fair Location Information Practices, WT Docket No. 01-72, at 2 (filed Nov. 22, 2000). The petition also asked the Commission to implement privacy guidance for location information. *Id.* at 8.

The Commission denied CTIA's petition in 2002, finding it unnecessary to "establish[ ] a clear framework for industry to design the services and consumers to predict how their location information will be handled." *Request By CTIA to Commence Rulemaking to Establish Fair Location Info. Pracs.*, Order, 17 FCC Rcd. 14832, ¶ 6 (2002). It concluded that "because of the nascent state of [commercial wireless location-based] services, [the agency did] not wish inadvertently to constrain technology or consumer choices via [FCC] rules."[2] *Id.* ¶ 7.

---

[2] Shortly thereafter, the Commission represented that "[t]he standard for use of wireless location information will be addressed in a separately docketed proceeding." *Implementation of the Telecomms. Act of 1996*, Third Report and Order and Third Further Notice of Proposed Rulemaking, 17 FCC Rcd. 14860, ¶ 7 n.20 (2002). The Commission never opened such a proceeding.

**D.    The Commission Adopted A "Reasonable Measures" Standard For Handling CPNI And Held That Only Call Location Information Qualifies As CPNI.**

Following the 911 Act, the Commission also adopted rules that address how providers must handle CPNI.    Section 222(a) provides that "[e]very telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to … customers."   47 U.S.C. § 222(a).   In 2007, in response to a petition filed by the Electronic Privacy Information Center ("EPIC"), the Commission purported to "codify" this "statutory requirement."   *See Implementation of the Telecomms. Act of 1996*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd. 6927, ¶¶ 33-34 (2007) ("*EPIC CPNI Order*").   Specifically, the Commission imposed a general requirement for providers to take "reasonable measures to discover and protect against" unauthorized disclosures of CPNI.   *Id.* at Appendix B; *see* 47 C.F.R. § 64.2010(a).   The Commission declined to impose minimum CPNI safeguards on providers, and instead opted for a risk-based and flexible framework that "allow[s] carriers to implement whatever security measures are warranted in light of their technological choices," and "enable[s] market forces to improve carriers' security measures over time." *EPIC CPNI Order* ¶ 65.

In 2013, the Commission finally weighed in on how the 911 Act amendments to Section 222 changed the meaning of CPNI.   It clarified that "location" in Section

7

222(h) refers to call location information—holding, in a declaratory ruling, that the "location of a customer's *use of a telecommunications service* … clearly qualifies as CPNI." *Implementation of the Telecomms. Act of 1996*, Declaratory Ruling, 28 FCC Rcd. 9609, ¶ 22 (2013) (emphasis added) ("*2013 CPNI Declaratory Ruling*"). And the "use of a telecommunications service," the Commission explained, means a call. The agency found that "data on when and where calls fail" and "the location … a handset experiences a network event, such as a dialed or received telephone call or a dropped call" meet "the statutory definition of CPNI" because they "*reveal call details*." *Id*. ¶ 25 (emphasis added) (cleaned up).

Then, in October 2016, the Commission adopted the *Broadband Privacy Order*, which sought to apply Section 222's requirements to broadband providers following the agency's 2015 decision to classify broadband internet access service as a "telecommunications service" under the Communications Act. *Protecting the Priv. of Customers of Broadband and Other Telecomms. Servs.*, Report and Order, 31 FCC Rcd. 13911, ¶ 1 (2016) ("*Broadband Privacy Order*").

In doing so, the FCC opined that the CPNI definition includes, among other data elements, "geo-location." *Id.* ¶ 53. However, the Commission's discussion of the meaning of "geo-location" data in the *Broadband Privacy Order* suggested that the agency did not intend this phrase to encompass any and all passively-collected data. Instead, the FCC intended "geo-location" to mean location data collected while

8

the device is in use.  *See id.* ¶ 65 ("Providers often need to know where their customers are so that they can *route communications* to the proper network endpoints.") (emphasis added).  Indeed, the Commission asserted that the agency had "already held that geo-location is CPNI," quoting the *2013 Declaratory Ruling*, and in particular, the Commission's prior statement that "[t]he *location of a customer's use* of a telecommunications service also clearly qualifies as CPNI."  *Id*. ¶ 65 & n.126 (quoting *2013 CPNI Declaratory Ruling* ¶ 22) (emphasis added).

Just months after the Commission adopted the *Broadband Privacy Order*, Congress exercised its authority under the Congressional Review Act ("CRA"), 5 U.S.C. § 802(a), to vacate the *Broadband Privacy Order* in its entirety and nullify the associated regulatory changes.  *See* Pub. L. No. 115-22, 131 Stat. 88 (2017).  The CRA provides that an agency may not issue a new rule in the future that "is substantially the same" as the one Congress disapproved.  5 U.S.C. § 801(b)(2).  Following Congress's disapproval of the *Broadband Privacy Order*, the Commission reclassified broadband internet access service as an information service, exempt from all of Title II, including Section 222.  *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 (2018).

9

## ARGUMENT

### I.    THE FORFEITURE ORDER MISINTERPRETS THE STATUTE.

The Commission errs in finding that the location information at issue in the Forfeiture Order is CPNI. *First*, the information does not "relate[ ] to the … location … of use of a telecommunications service." *Second*, the information was not "made available to the carrier by the customer solely by virtue of the carrier-customer relationship." *Third*, as the Supreme Court recently made clear, the Commission cannot rescue its atextual readings of the statute with claims of deference.

### A.    The Information Does Not Relate to the "Location Of Use Of A Telecommunications Service."

Verizon's location data is not CPNI because it does not "relate[ ] to the … location … of use of a telecommunications service subscribed to by any customer of a telecommunications carrier."  47 U.S.C. § 222(h)(1)(A).  The reason is simple.  Verizon collected location data passively—not when the customer "used" a telecommunications service (i.e., voice calling).  Forfeiture Order (Carr Dissent) (JA87) ("The customer did not need to make a call to convey his or her location.").  Indeed, "'use' impl[ies] action and implementation," not "passive, passing, or ancillary." *Dubin v. United States*, 599 U.S. 110, 118-19 (2023) (cleaned up).  And that understanding makes good sense here because the information must also be "made available to the carrier *by the customer*." 47 U.S.C. § 222(h)(1)(A) (emphasis added).  "The customer" must do something; the statute is not concerned with

10

information in the abstract. Thus, passive background collection—untethered from a customer's use of the telecommunications service—is not related to the "use of" the service.

This use-oriented reading accords with the statutory purpose. As explained, Congress added the "location" provisions to Section 222 in 1999 as part of a larger effort to regulate—and permit the disclosure of—call location information for 911 services. The 911 Act was intended to allow emergency services to "determine the location of *the caller*" using a "wireless phone[ ]." S. Rep. No. 106-138, at 2 (emphasis added). With that new enactment, Congress also wanted to "provide[ ] privacy protection for *the call location information of users* of wireless phones." *Ibid.* (emphasis added).

The resulting statutory structure reflects that purpose. Providers are authorized "to provide *call location information*" in certain circumstances, notwithstanding the general protection of CPNI in Section 222(c)(1). 47 U.S.C. § 222(d)(4) (emphasis added). Congress defined customer approval, for purposes of Section 222(c)(1), to mean "express prior authorization" in the context of "*call location information*," while customer approval can be inferred for other CPNI from a failure to opt out. *Id.* § 222(f) (emphasis added). And to ensure privacy provisions for call location information, Congress added "location" to the definition of CPNI— i.e., information that relates to the "location … of use of a telecommunications

11

service"—with the "use" being a call. *Id.* § 222(h)(1)(A). The Commission previously affirmed this "straightforward" reading of the statute, opining that the "definition" reached "the location of the device *at the time of the calls*." *2013 CPNI Declaratory Ruling* ¶ 22 (emphasis added).

The Commission flouts the text, structure, and purpose by applying "the rule of the last antecedent." Forfeiture Order ¶ 24 (JA54) (quotation omitted). That is, the Commission says that the phrase "of use" in Section 222 modifies only the last word in the clause—"amount." On that reading, the FCC holds that CPNI includes information that relates to the location of a telecommunications service, not the location *of use* of a telecommunications service.

But "the rule of the last antecedent is context dependent," *Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 (2021), and the Commission simply ignores the relevant context here—i.e., Congress's intention to collect and provide corresponding protections for "call location information," 47 U.S.C. § 222(f)(1), which is generated through "use of a telecommunications service," *id.* § 222(h)(1)(A); *accord 2013 CPNI Declaratory Ruling* ¶ 22 ("The *location of a customer's use of a telecommunications service* also clearly qualifies as CPNI.") (emphasis added).

The Commission's reading also would make a mess of the statute. Without the "of use" modifier, CPNI would include the "location of a telecommunications service." But a "telecommunications service" is "the offering of

12

telecommunications for a fee directly to the public." 47 U.S.C. § 153(53). On the Commission's reading then, Section 222 would protect information related to the "location of the offering"—presumably a retail storefront. But that would neither cover the data at issue in the Order, nor would it be rational. By contrast, the "location of use of a telecommunications service" covers call location information, consistent with statutory context.

The Commission runs into the same problem with the other enumerated information categories. For example, "quantity of a telecommunications service" would refer to the quantity of an "offering"—a phrase without clear meaning. But "quantity of use of a telecommunications service" refers to the number of calls made using the service—a natural corollary to "amount of use," which refers to the amount of time spent using the service. "Destination" of an "offering" is a mystery. "Destination of use" of the service refers to numbers called when using the service. Thus, "of use" must modify the entire list for it to make any sense.

The Order's counterexample only confirms this reading. The Commission claims that if "of use" modified the other phrases in the list, "it would lead to apparently anomalous results" because "it is not clear what 'technical configuration of use' would mean." Forfeiture Order ¶ 24 (JA54). But it is clear what it would mean: the technical aspects that facilitate "use" of the service, such as data about when a customer uses roaming services. By contrast, the Commission's preferred

13

reading—"technical configuration of a telecommunications service"—would refer to the technical configuration of only the underlying "offering." But that cannot be right because abstract data about the offering—untethered from customer use—is not "made available" by "the customer." 47 U.S.C. § 222(h)(1)(A). Indeed, information about the underlying "offering" is, by definition, made available to the public, and thus information about it cannot be CPNI.

The Commission's reliance on "initiate" is also misplaced. The Commission says the statute allows the use of CPNI without customer consent to "initiate" services, *id.* § 222(d)(1), and initiation "ordinarily occur[s] before the service is in 'use,'" Forfeiture Order ¶ 24 (JA54). But customers provide carriers with information about their "type of use" when they initiate their service by selecting the service plan they purchase and then will use. And they provide carriers with information about the "location of use" when they initiate service for a landline. Thus, initiation-based usage is in accord with the statutory text, structure, and purpose.

Finally, as Verizon rightly points out, even if the Commission were correct that "of use" does not modify "location," the statute would still not reach passively-collected device-location information. Pet. Br. 33-36 & n.12. As explained, "location of a telecommunications service" makes little grammatical sense. But there are strong indications that "location of a telecommunications service" would

14

not mean "location of a device that can use a telecommunications service," as it must for the Commission's novel interpretation to prevail.  For one, if Congress intended to protect the location of such a device, it could have used one of the defined statutory terms that refer to devices: "mobile station," 47 U.S.C. § 153(34), or "customer premises equipment," *id.* § 153(16).  But Congress instead added "location" to a statutory definition that is anchored to the "telecommunications service" and information "made available … by the customer."  These terms plainly presuppose a call because that is when the "customer" interacts with the "service" and thereby "makes available" location information to the carrier.  And, as explained, that reading is supported by the broader context of the 1999 statute, which was concerned exclusively with call location information.  Thus, even if the rule of the last antecedent applies, the Commission still misinterprets the statute.

### B.    The Information Was Not Made Available "Solely By Virtue Of The Customer-Carrier Relationship."

Regardless of whether the location information at issue "relates to the … location … of use of a telecommunications service," the Order's reading of the statute is independently wrong for another reason.  Verizon's location data was not "made available to the carrier by the customer *solely* by virtue of the carrier-customer relationship," 47 U.S.C. § 222(h)(1)(A) (emphasis added), and thus the data fails to satisfy the other half of the statutory definition.

15

The text is dispositive.  Start with the word "solely."  It means "being the only one."  *Solely*, Merriam-Webster's Dictionary 1118 (10th ed. 1994).  Next "by virtue of," which means "by reason of."  *By virtue of*, Webster's Third New International Dictionary 307 (1993).  And finally "carrier-customer relationship."  The word "carrier" refers back to an earlier term in the phrase: "telecommunications carrier," which is "any provider of telecommunications services" but "*only* to the extent that it is engaged in providing telecommunications services."  47 U.S.C. § 153(51) (emphasis added).  So, taken together, information is CPNI when it is made available for only one reason: the provision of a telecommunications service.  If the information was made available for a different reason or for multiple reasons, then it flunks the "solely" requirement.

The location data at issue in the Forfeiture Order fails to satisfy the "solely" clause.  All agree that Verizon offers customers a service bundle that includes both a telecommunications service (voice calling) *and* information services (messaging and broadband).  *See* Forfeiture Order ¶¶ 32-33 (JA57-58) (acknowledging that Verizon provides "SMS text messaging and internet service" to its telecommunications customers).  And because these services are "mutually exclusive," *Mozilla Corp. v. FCC*, 940 F.3d 1, 19 (D.C. Cir. 2019), the information-service offerings are not also telecommunications-service offerings.  Further, Verizon collected location information from the bundled-service customers *and* the

customers that used *only* an information service—i.e., those who use tablets or mobile hot spots that can access the internet but that lack cellular voice-calling capabilities.  Forfeiture Order ¶ 33 (JA58).  Thus, even for customers who purchased a bundled service, the location data involved in this proceeding was "made available" to Verizon "by virtue of" both the "carrier-customer relationship" *and* the information-service-provider-customer relationship.  *See* Pet. Br. 30.  Each relationship was independently sufficient for Verizon to obtain the data.  Forfeiture Order (Carr Dissent) (JA88) ("The carrier could have obtained the customer's location … even in the absence of a voice plan.").  Thus, the location data was not provided to Verizon "solely" because of the customer-carrier relationship.

Prior Commission precedent is in accordance with that reading of the text.  The Commission previously held "that information that is not received by a carrier in connection with its provision of telecommunications service can be used by the carrier without customer approval." *Implementation of the Telecomms. Act of 1996*, Order on Reconsideration, 144 FCC Rcd. 14409, ¶ 158 (1999).  Thus, the agency explained, "customer information derived from information services … may be used, even if the [customer's] telephone bill covers charges for such information services." *Ibid.*

The Forfeiture Order has no answer to the plain meaning of the statute *that the Commission previously endorsed*.  It instead repeatedly insists that Verizon and

some of its customers had *a* customer-carrier relationship.  Forfeiture Order ¶¶ 29-31 (JA56-57).  True enough, for those customers purchasing a telecommunication service like cellular voice calling from Verizon.  But that was not Verizon's only relationship with those customers.  It *also* sold them information services.  Those information services *also* made available the location data.  And Verizon also had customers with which it had *only* an information-service-provider relationship, which was sufficient to make the location data available.  So it does not matter that Verizon had, with some customers, a "carrier-customer relationship" that allowed it "to obtain the location data at issue here," Forfeiture Order ¶ 31 (JA57), because that was not the "sole[ ]" relationship that allowed it to obtain the data, 47 U.S.C. § 222(h)(1)(A).  The Commission cannot read "solely" out of the statute.

## C.    Deference Cannot Save The Commission's Interpretation.

The Commission may no longer salvage atextual statutory readings with judicial deference, nor claim the power to reverse course on a prior interpretation of the statute for policy reasons.  The Supreme Court "overruled" *Chevron*, so this Court "must exercise … independent judgment in deciding whether an agency has acted within its statutory authority."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  In exercising that judgment, the Court must give the statute its "single, best meaning … fixed at the time of enactment."  *Id.* at 2266 (quotations omitted).

18

The Commission's reading is also not entitled to respect under *Skidmore*.  *See id.* at 2259.  For one, the Commission's interpretation of Section 222 was not "issued contemporaneously with the enactment of the statute," nor is it "consistent[ ] with earlier … pronouncements."  *Ibid.*  To the contrary, its interpretation—issued decades after the statute's enactment—is a sharp departure from years of precedent, as set forth above.  And the interpretation does not depend upon "specialized experience."  *Ibid.*  The parties agree on the underlying technical facts, and the Commission's interpretations turn on canons of construction and lay dictionary definitions.  *See, e.g.*, Forfeiture Order ¶¶ 24 (JA54) (invoking "rule of the last antecedent"), 25 n.91, 26 n.94 (JA55) (citing dictionaries).  These interpretive tools are the standard fare of judicial interpretation, not factual analysis.  Thus, the Commission's reasoning has no special "power to persuade."  *Loper Bright*, 144 S. Ct. at 2259.

## II.    THE FORFEITURE ORDER VIOLATES FAIR NOTICE.

The Fifth Amendment provides, in part, that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. Thus, the Government must "give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  This Court has found that regulations "satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the

19

objectives the regulations are meant to achieve, has fair warning of what the regulations require." *Cunney v. Bd. of Trs. of Vill. of Grand View*, 660 F.3d 612, 621 (2d Cir. 2011) (quoting *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999)). And an agency "may not sanction" an entity "pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996).

Here, the language of Section 222 failed to "give [Verizon] fair notice of conduct that is forbidden or required." *Fox*, 567 U.S. at 253. Even if the best reading of the statute is the one articulated for the first time in the Forfeiture Order, that reading is far from clear. The statute is at the very least ambiguous—and the years of Commission precedent set forth above gave Verizon no reason to think the statute applied to all passively-collected location information. In fact, the Commission's precedent was fully consistent with Verizon's reading of the statute. Moreover, the Commission failed to provide fair notice to Verizon that its data-security measures would violate 47 C.F.R. § 64.2010(a).

## A. Section 222 Did Not Afford Verizon Fair Notice That CPNI Includes Passively-Collected Location Information.

The language of Section 222 did not provide Verizon with fair notice that passively-collected location information fell within the definition of CPNI. As explained above, two significant textual hurdles point the other way: (i) the "of use" modifier, and (ii) the phrase "solely by virtue of the carrier-customer relationship."

20

*See supra*; *cf. Loper Bright*, 144 S. Ct. at 2285 (Gorsuch, J., concurring) (explaining that "textualism serves as an essential guardian of the due process promise of fair notice"). The structure and purpose of the statute are in accord, reflecting Congress's intent to provide privacy protections for call location information in the 911 Act. *See supra*.

But even if, after applying the tools of statutory construction, this Court determines that the "single, best meaning … fixed at the time of enactment," *Loper Bright*, 144 S. Ct. at 2266 (quotations omitted), is that the statute does apply to all passively-collected data, that conclusion could come only after resolving significant ambiguity in the statutory language. Because "a person of ordinary intelligence" would not have had "fair notice" of that statutory import, *Fox*, 567 U.S. at 253, applying the FCC's construction for the first time in an enforcement posture would prevent "regulated parties [from] know[ing] what is required of them so they may act accordingly." *Ibid.*

Moreover, the FCC did nothing to resolve this ambiguity in favor of its current reading of the statute prior to launching this enforcement proceeding. To the contrary, the FCC precedent discussed in detail above *confirmed* Verizon's straightforward textual reading, rather than refuting it. For example, in 2013, the Commission declared that Section 222(h) covered the "*location of a customer's use* of a telecommunications service" because that "use"—e.g., "a dialed or received

telephone call or a dropped call"—"reveal[s] call details." *2013 CPNI Declaratory Ruling* ¶¶ 22, 25 (quotations and alterations omitted) (emphasis added). In other words, the Commission endorsed the exact interpretation of Section 222(h) that it now says is so wrong that it warrants a $46.9 million penalty. The FCC "took no steps to advise the public" regarding its interpretation before issuing the Order, which is a textbook fair-notice violation. *Upton*, 75 F.3d at 98.

Following Congress's rejection of the *Broadband Privacy Order*, providers had even more reason to believe that Congress did not intend for Section 222 to apply to all device location information. The *Broadband Privacy Order* is the sole instance where the Commission even arguably sought to extend the definition of CPNI to a broader category of device location information,[3] and Congress rejected it. And while the CRA prevents the FCC from issuing a new rule that is "substantially the same" as the *Broadband Privacy Order*, 5 U.S.C. § 801(b)(2), the Commission could have issued a decision clarifying that the FCC nevertheless believed CPNI includes passively-collected geo-location data. The agency declined to do so.

---

[3] However, as explained above, it is not even clear that was the Commission's intention because the *Broadband Privacy Order* claimed its interpretation of Section 222 was consistent with the *2013 CPNI Declaratory Ruling*, which expressly tied Section 222(h) to call location information. *See supra*.

The Commission's primary response to these fair-notice concerns is that Verizon should have expected the unexpected. In the agency's view, because the FCC never "set out a comprehensive list of data elements that pertain to a telecommunications service and satisfy the definition of CPNI," parties could not "reasonably have assumed that the fact a given scenario had not been expressly addressed by Commission rules and precedent meant it fell outside the scope of CPNI." Forfeiture Order ¶ 38 (JA59-60). To explain this argument is to reject it. The obligation is on *the Government* to give the public fair notice. It is not on *the public* to divine meaning from regulations that are "remarkably unclear." *Cunney*, 660 F.3d at 621.

The Commission's final defense is a tautology. It states that "implicit in section 222 is a rebuttable presumption that information that fits the definition of CPNI contained in section 222([h])(1) is in fact CPNI." Forfeiture Order ¶ 38 (JA60) (cleaned up). But that "presumption" amounts to nothing more than assuming the agency's conclusion.

### B. The Commission Failed to Afford Verizon Fair Notice That Its Security Measures Violated Agency Rules.

The Commission also did not provide Verizon fair notice that its measures were not "reasonable" enough to protect CPNI, in violation of 47 C.F.R. § 64.2010(a). Pet. Br. 40-41. Indeed, the agency never required any specific CPNI security measures and instead advised providers to "implement whatever security

23

measures are warranted" and "reasonable" "in light of the threat posed … and the sensitivity of the customer information at issue." *EPIC CPNI Order* ¶¶ 63-65.

To satisfy these obligations, Verizon did implement safeguards, including industry-leading protocols. Verizon mandated that its LBS service provider contracts "require the participating service providers to implement and maintain multiple types of security controls, to prevent unauthorized disclosure of Verizon's data, and to comply with consumer protection laws, data privacy laws, and industry best practices," including CTIA's "Best Practices and Guidelines for Location-Based Services" ("CTIA Best Practices"). Pet. Br. 16. Verizon also required service providers to obtain "affirmative consent to share device-location information before requesting that information" and to submit to "regular audits, of each provider to ensure that customers had affirmatively consented to the sharing of their location information and that the participant used the information only as authorized." *Id.* at 14-15. Verizon required each service provider to "submit (i) a detailed description of its use case; (ii) specific details of how customers would be informed about the use of their location information; (iii) a detailed description of the affirmative, opt-in consent process; and (iv) a full description of the process for customers to opt out." *Id.* at 15. Moreover, through third-party auditor Aegis, Verizon required reviews of each LBS service provider on at least an annual basis to verify compliance. *Ibid.* And Verizon rapidly and systematically improved its safeguards

24

when necessary, in stark contrast to the agency's inaction on location data. *Id.* at 21-22.

Although the Commission now claims that the CTIA Best Practices were inapplicable to Verizon's use case because "they do not offer guidance to carriers on how to assure that location-based service providers comply with a contractual obligation to access location information," Forfeiture Order ¶ 48 (JA64), this argument discounts the numerous other safeguards that Verizon implemented for location-based service providers. And while the Commission takes issue with Verizon's contractual provisions for a host of reasons, including the sufficiency of how Verizon "monitor[ed] customer consents," *ibid.*, the Commission never put Verizon on notice that the flexible, risk-based security measures adopted in the *EPIC CPNI Order* included prescriptive contractual requirements. The Commission can hardly fault Verizon for not understanding that its measures would be insufficient when the sum total of the agency's guidance was to implement "whatever security measures are warranted" and "reasonable."

Ultimately, both this Court and the Supreme Court have recognized that when an "agency changes which behavior violates its regulations, it must provide notice that it has done so before faulting any of those it regulates for engaging in the newly verboten behavior." *Citizens United v. Schneiderman*, 882 F.3d 374, 389 (2d Cir.

2018) (citing *Fox*, 567 U.S. at 254-58).  Because the FCC did not provide this notice, the Court should vacate the Forfeiture Order.

## III.    THE FORFEITURE ORDER VIOLATES THE SEVENTH AMENDMENT.

The Seventh Amendment provides that "the right of trial by jury shall be preserved" in "Suits at common law, where the value in controversy shall exceed twenty dollars."  U.S. Const. amend. VII.

In *SEC v. Jarkesy*, 144 S.Ct. 2117 (2024), the Supreme Court reaffirmed that the Seventh Amendment applies in the administrative-enforcement context.  The Court held that a party was entitled to a jury trial when the SEC sought "civil penalties against him for securities fraud." *Id.* at 2127.  It explained that the SEC's remedy—"civil penalties"—triggered the Seventh Amendment because it was "a type of remedy at common law that could only be enforced in courts of law." *Id.* at 2128-30.  Although the remedy was "all but dispositive," the Court also held that "the close relationship between federal securities fraud and common law fraud confirm[ed] that th[e] action [wa]s 'legal in nature.'" *Id.* at 2129-31.  And the Court held that the "public rights exception" to the Seventh Amendment did not apply because the SEC sought a "punitive remedy" and targeted "the same basic conduct as common law fraud." *Id.* at 2135-36.

*Jarkesy* controls this case.  The FCC's forfeiture is "designed to be punitive." *Id.* at 2130.  It considers the "gravity of the violation," "the degree of culpability,"

and "any history of prior offenses"—considerations which confirm a punitive purpose. 47 U.S.C. § 503(b)(2)(E). Further, Congress expressly designated FCC forfeitures as a "penalty" in the statute. *Id.* § 503(b)(1). And just like the SEC, the FCC "is not obligated to return any money to victims." *Jarkesy*, 144 S. Ct. at 2130. Thus, like the civil penalties in *Jarkesy*, the forfeiture here is "designed to punish and deter," and that "conclusion effectively decides that this suit implicates the Seventh Amendment right." *Ibid.*

Although the nature of the remedy is dispositive, the Commission's proceedings are also analogous to a common-law negligence claim. *Compare* Restatement (Third) of Torts § 3 (Am. L. Inst., June 2024 Update) ("A person acts negligently if the person does not exercise reasonable care under all the circumstances."), *with* Forfeiture Order ¶ 42 (JA61) (holding Verizon "fail[ed] to take reasonable measures"). And because the FCC seeks a punitive remedy that targets the same basic conduct as common-law negligence, the public-rights exception does not apply. *Jarkesy*, 144 S. Ct. at 2135-36.

The Commission incorrectly argues that there is no Seventh Amendment problem because "Verizon is entitled to a trial *de novo*" under Section 504(a) of the Communications Act "before it can be required to pay the forfeiture." Order ¶ 91 (JA78). The Commission is wrong on two fronts.

*First*, Verizon is not "entitled" to a trial. Rather, parties are subject to a trial only when the Government brings a "suit for the recovery of a forfeiture." 47 U.S.C. § 504(a). The United States, however, does not always bring recovery suits and sometimes takes many months to initiate them. In the illegal robocalling context, for example, the FCC has referred nine failures to pay forfeitures to the Department of Justice ("DOJ") for collection since 2017. *Report to Congress on Robocalls and Transmission of Misleading or Inaccurate Caller Identification Information*, FCC, at 6-7 (Dec. 27, 2023). The DOJ has sued to collect just one of those forfeitures. *See* Press Release, Federal Court Enters $9.9M Penalty and Injunction Against Man Found to Have Caused Thousands of Unlawful Spoofed Robocalls, DOJ (Mar. 22, 2024), https://tinyurl.com/2vf2hfvu. And it appears to have allowed five of the eight referrals to become time-barred under the five-year statute of limitations.[4] *See* 28 U.S.C. § 2462. Thus, a party may have to wait *years* for its day in court (if it ever comes). And, in the meantime, the party must continue operations with the threat of liability hanging over it. This pending liability can affect parties' ability to access credit and close transactions, among other business impediments. And the party has no way to end the legal uncertainty until (and if) the Government chooses to

---

[4] This Court has suggested that the statute of limitations runs from the date of the underlying violation. *See SEC v. Fowler*, 6 F.4th 255, 260 (2d Cir. 2021) ("The SEC alleged that Fowler's fraudulent scheme began in 2011, meaning that the statute of limitations would ordinarily have expired in 2016.").

prosecute or allows the limitations period to expire. A constitutional right that exists at the sole discretion of federal prosecutors is no right at all.

*Second*, the trial to which Verizon might have been subjected could potentially come at the cost of judicial review. While this Court has not had the occasion to address the question directly, other courts have held that a defendant in a "trial" under section 504(a) cannot raise "legal challenges" to the agency's authority. *United States v. Stevens*, 691 F.3d 620, 622-23 (5th Cir. 2012). In the so-called "trial," the district court must "adhere to the FCC's interpretation of the Act, no matter how wrong the FCC's interpretation might be." *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 11 (2019) (Kavanaugh, J., concurring). Thus, in order to preserve its statutorily-conferred right to "*de novo* judicial review," *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2459 n.9 (2024), Verizon was forced to pay the fine and forfeit its Seventh Amendment right to a jury trial, *AT&T Corp. v. FCC*, 323 F.3d 1081, 1085 (D.C. Cir. 2003). That is unconstitutional, because it conditions Verizon's access to judicial review "on the surrender of a constitutional right." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

At bottom, the FCC cannot use an illusory "trial" to remedy its Seventh Amendment violation.

## CONCLUSION

In light of the foregoing, this Court should vacate the Forfeiture Order.

Dated: November 11, 2024        Respectfully submitted,

_/s/ Joshua S. Turner_
Joshua S. Turner
  _Counsel of Record_
Sara M. Baxenberg
Boyd Garriott
Stephen J. Conley
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000
Jturner@wiley.law

_Counsel for_ Amicus Curiae

30

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rule 29.1(c) because it is filed under Federal Rule of Appellate Procedure 29(a) and contains 6,715 words.

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced 14-point Times New Roman font.

Dated: November 11, 2024              */s/ Joshua S. Turner*
                                      Joshua S. Turner

## CERTIFICATE OF SERVICE

I certify that on November 11, 2024, I caused the foregoing to be served upon

all counsel of record via the Clerk of Court's CM/ECF notification system.

Dated: November 11, 2024                 */s/ Joshua S. Turner*
                                          Joshua S. Turner